# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
July 20, 2010 Session

## STATE OF TENNESSEE v. KEVIN E. SHEPARD

**Direct Appeal from the Circuit Court for Hickman County**
**No. 08-5104CR     Timothy Easter, Judge**

**No. M2009-02131-CCA-R3-CD - Filed December 22, 2010**

The defendant, Kevin E. Shepard, was convicted after a bench trial of reckless endangerment involving a deadly weapon, a Class E felony, and was sentenced to two years, suspended to supervised probation. On appeal, he argues that the evidence is insufficient to sustain his conviction. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Michael J. Flanagan, Nashville, Tennessee, for the appellant, Kevin E. Shepard.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Kim R. Helper, District Attorney General; and Joseph Fahey, II, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of the defendant's, a bail bondsman, attempt to arrest Matthew Haddock, who failed to appear in court. As a result of his actions during the pursuit, the defendant was indicted on one count of reckless endangerment with a deadly weapon.

### State's Proof

At trial, Patricia Prock testified that she lived on Betty Bell Lane in rural Hickman County. On June 4, 2008, just after 9:00 p.m., Prock was sitting on her front porch waiting

for her son to return home from church with his grandmother. She said that her son had spina bifida and walked with crutches, so she routinely waited on him to assist him into the house. Prock said that Kelly and Melissa Cunningham lived in the home next to her. Terry and Jessica lived in the home next to the Cunninghams, but Prock did not know their last name. Prock said she could see the Cunninghams' home from her porch, and she estimated that their houses were about the same distance apart as the distance from the witness stand to the back of the courtroom.

Prock testified that she saw a truck, without its headlights on, pull into the driveway of the house two doors down from hers, where Terry and Jessica lived. Prock saw the front door of the house open, and within "a few seconds," she heard male voices. She could not tell if the men were arguing, but then she heard that the men had come outside and "[y]ou [could] tell that it wasn't no friendly conversation." Prock heard a girl start screaming and recognized the voice as Jessica's. Jessica was screaming, "'[S]omeone call 9-1-1, please call 9-1-1.'" Prock immediately called 9-1-1.

Prock testified that the two people who were arguing had come up a path that ran between all of the homes and were in the Cunninghams' driveway. By that time, Kelly Cunningham turned his porch light on and was outside on his porch. Prock said that the younger of the two men was closer to her and that the other man was "out across the driveway[.]"

Prock testified that when she turned to see if her family was driving up the road yet, a shot was fired. She fell to her knees, crawled to the front door, turned the porch light off, and went inside. Realizing that her family was on the way home, Prock turned the light back on in time to see her mother-in-law and son driving down the road toward her house. Prock ran to the end of her driveway to intercept her family, but by that time, the two men had entered her yard. The men did not announce their names or what they were doing, but she kept hearing one of them say, "'Get down on the ground[.]'" Prock's mother-in-law pulled into the driveway, and the headlights shone on one of the men and she could tell that it was "Matt, the boy who had lived down there in that trailer." She verified that the man was Matt Haddock and said that he "had blood all over his face, all down his shirt."

Prock testified that the other man kept saying, "'[G]et on the ground, don't -- he's got a gun, don't get -- get away from him, get on the ground.'" She recalled that Haddock kept saying, "'I haven't done anything. . . . Just let me get to my mom's and get my papers and I can show you I haven't done anything.'" The other man told him to "'[g]et on the ground,'" and he was holding a "big" gun like a rifle.

Prock testified that Haddock walked toward her mother-in-law's car, while Prock screamed for her mother-in-law to drive away. The armed man told Prock's mother-in-law not to open the door for Haddock because he had a gun. Prock noted that Haddock did not touch the car; it appeared as if "he was trying to put distance between him and that man." The armed man kept his gun pointed at Haddock the entire time. Prock was within one step of the armed man and close enough to Haddock that she could have touched him. She said that the armed man never identified himself.

Prock testified that her mother-in-law was able to drive away from the scene. Once she drove away, Prock ran back into her house and turned to see that the two men were walking on the main road toward the house where the altercation started. She noted that Haddock was in front with the armed man walking behind him. The armed man kept ordering Haddock to "'[g]et on the ground.'"

Kelly Cunningham[1] testified that he lived in the house between Prock's house and Terry Minor's house. He said that his house was approximately 200 feet from Minor's house, with a path coming through the tree-line that separates the houses, and that he could see the Minors' front porch from his house. Kelly said that he and his wife were awakened on the night of the incident by the sound of their dogs barking. Cunningham opened the front door and "heard people screaming and hollering[.]"

Kelly testified that he saw Matt Haddock coming toward his house. Kelly estimated that his driveway was "maybe 50 or 60 feet" from the tree-line at the edge of his yard. Haddock was walking across his yard toward the driveway, and the defendant was "walking up the hill with a shotgun" pointed at Haddock. Neither man was running. Kelly called 9-1-1 and told the dispatcher what was happening.

Kelly told the defendant that he was trespassing, needed to put his gun down, and that he had "called the law for Matt." Kelly recalled that "Matt started up the hill towards [his] next neighbors, and then the gun was fired and then they went on up the hill and then they come back down the hill." Kelly stated that the men were standing in his driveway when the shot was fired, and he was approximately thirty feet away on his porch. Kelly described that when the shot was fired, the defendant was standing at the edge of the driveway, and Haddock "was standing in the yard above the driveway." The defendant was "[n]o more than ten feet" from Haddock when he fired his gun. The shot hit on the side of the driveway where Haddock was standing. After the shot, the two men "started on up the hill" in the direction of Prock's home.

---

[1] Because some of the witnesses have the same last name, we refer to them by first name only as necessary.

Kelly testified that he stayed on his porch for five or ten minutes, until the two men came back past his house. The men "walked right beside [Kelly's] porch" and continued on toward Minor's house. They passed so close to his house that Kelly "could have reached off [his] porch and touched either one of them." He noted that Haddock was in front of the defendant, and the defendant had his gun to Haddock's back. As the men went down the path to Minor's house, Kelly came off his porch and watched their progress. He saw Haddock go into Minor's house and shut the door, then the defendant pushed the door open and hit Haddock in the mouth with the butt of the shotgun. About that time, Kelly saw police cars approaching, so he "started down the driveway pointing them down the hill." Kelly stated that he did not know the defendant prior to this incident and that "[a] man in [his] yard with a shotgun pointing and waving it around kind of had [him] scared."

Melissa Cunningham testified that on the night of the incident, she was preparing to go to sleep when Prock called "frantic" about something. Kelly told her to stay inside the house while he investigated, but she went outside when he was on the phone with the 9-1-1 dispatcher. When she came outside, Melissa saw Matt Haddock and another man walk by their porch, and the other man had a gun pointed in Haddock's back. The men were walking toward Minor's house. Melissa related that she could almost touch the men from where she stood on the porch as they walked by. Melissa testified that Kelly told the armed man that he was calling the police, and the armed man responded that he did not care because he was "'the law.'" Melissa said that she heard a shot fired that night, but it occurred while she was still inside the house.

Deputy Mary Capintog with the Hickman County Sheriff's Department testified that she received a "shots fired" call and responded to the scene in this case. En route, the dispatcher informed Deputy Capintog that an individual was firing a shotgun outside the home and that a bail bondsman might be on the scene. Deputy Capintog pulled her patrol car diagonally into a driveway, and a "young man ran out from the side of [the] trailer and he was screaming, 'help me, help me.'" As the young man got closer, Deputy Capintog noticed that he had blood on his face. Deputy Capintog saw another man exit the house, holding a shotgun "pointed in the upward motion." Deputy Capintog initially drew her weapon and pointed it at the man with the shotgun. However, she heard the defendant say "'handcuff that mother-fucker,'" and realizing he was the bondsman, she holstered her weapon and handcuffed Haddock. Haddock was not armed when he was taken into custody.

Detective Scott Smith with the Hickman County Sheriff's Department testified that he visited Haddock in the hospital later the night of the incident and took a photograph of his injuries. Detective Smith also spoke with the defendant that night at the scene and obtained the defendant's shotgun. The defendant reported that he had attempted to "serve . . . a failure to appear warrant or capias on Mr. Haddock." The defendant was aware that

Haddock's girlfriend resided at that address, so the defendant knocked on the door and was met by a white male. The male was hesitant to identify himself to the defendant, but the defendant identified him as Matt Haddock by his tattoos. The defendant related to Detective Smith that he seized Haddock by the arm and a struggle ensued.

Detective Smith testified that the defendant further told him that he informed Haddock that he had a warrant for his arrest, but they continued to struggle. The defendant was armed with a handgun and drew it during the struggle. Haddock grabbed at the defendant's handgun, but the defendant retained it. Haddock then retreated from the house, and the defendant chased him. The defendant told Detective Smith that he reholstered his handgun, retrieved the shotgun from his vehicle, and continued to chase Haddock. The defendant admitted to Detective Smith that he fired a round from his shotgun in an effort to get Haddock to stop, but the pursuit continued. Detective Smith later found unfired shotgun shells in the Minors' house consistent with the shells recovered with the defendant's shotgun. The next morning, he also found a spent shotgun shell "midway" in the Cunninghams' driveway.

### Defendant's Proof

Roger Mays, a dispatcher at the Centerville Police Department, testified that the defendant called to inform them that he was going to Betty Bell Lane in an attempt to apprehend someone. Mays said that was the normal procedure in Hickman County when a bondsman was going out to look for an individual. On cross-examination, Mays stated that the defendant never called to let the police know that he was having trouble and needed backup.

The defendant testified that he talked to Haddock's mother the afternoon of the incident, and she informed him that the defendant was living with Jessica Minor at Minor's home on Betty Bell Lane. The defendant testified that he went to the Minor residence, and a male answered the door. Although the male denied being Matt Haddock, the defendant recognized him from photographs and his tattoo, and the defendant informed him that he had a warrant for his arrest for failure to appear in court.

The defendant attempted to take Haddock into custody but was met with physical resistance, and a fight ensued between the two men. Haddock went into a bedroom, and the defendant drew his handgun out of concern that Haddock might be retrieving a weapon. When Haddock exited the bedroom, the defendant pointed his gun at the ground between them. The defendant yelled for Jessica Minor to call 9-1-1 because he wanted to get law enforcement involved, but she said that they did not have a phone.

The defendant testified that Haddock grabbed at his handgun, but the defendant retained it and Haddock retreated out the back door of the house. The defendant went to his vehicle to retrieve a flashlight, and he noticed a shotgun and took it to pursue Haddock. The defendant headed down the path he had seen Haddock traveling and caught up with him at the Cunningham residence. The defendant saw Haddock heading up to the porch where Kelly Cunningham was standing, and the defendant yelled for Kelly to not let Haddock inside the house.

The defendant testified that Haddock entered the Cunningham house for a couple of seconds, then exited and headed back down the driveway. The defendant "ratcheted" his shotgun, hoping the sound might stop Haddock, but Haddock kept moving. The defendant stated that he was "worn out" and "tired" from their struggle, so he pointed his gun to the left and fired into the ground about four feet away in an effort to stop Haddock. The defendant said that he shot into the ground instead of the air because "[he] knew exactly where that round was going."

The defendant testified that after the discharge of his weapon, Haddock proceeded toward Prock's house and headed toward a car that was running in her driveway. The defendant yelled that Haddock was under arrest and not to let him into the car, and the car drove away. The defendant said that he then followed Haddock down the road back toward the Minors' house with his gun pointed toward Haddock's feet. The defendant stated that Haddock attempted to abscond back into the Minors' house, and the two had a further confrontation. A deputy from the sheriff's department eventually arrived, and Haddock was taken into custody.

On cross-examination, the defendant testified that on the return trip back toward the Minors' house, he and Haddock walked on the main road, not the path, and they did not pass by the Cunninghams' porch. On examination by the court, the defendant estimated that Haddock was "somewhere inside of 30 feet" away from him when he fired the shot.

After the conclusion of the proof, the trial court observed that the critical question was whether there was a reasonable probability that the defendant's conduct placed "other people, such as Kelly Cunningham, Matthew Haddock, Patricia Prock, Ms. Prock's mother-in-law and her handicapped son" in imminent danger of death or serious bodily injury. The trial court found that the "proof has been established beyond a reasonable doubt that a reasonable probability existed that [the defendant's] conduct reasonably placed others in the zone of imminent danger of death or serious bodily injury as charged."

## ANALYSIS

The defendant argues that the evidence does not support his conviction because no one was in the zone of danger when he fired his weapon. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The findings of the trial judge in a bench trial carry the same weight as a jury verdict. State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999).

A person commits the offense of reckless endangerment "who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code. Ann. § 39-13-103(a) (2006). Reckless endangerment committed with a deadly weapon is a Class E felony. Id. § 39-13-103(b). To demonstrate an imminent danger of death or serious bodily injury, the State must show that a person or class of persons was "placed in a reasonable probability of danger as opposed to a mere possibility of danger." State v. Payne, 7 S.W.3d 25, 28 (Tenn. 1999). The "zone of danger" is "that area in which a reasonable probability exists that the defendant's conduct would

-7-

place others in imminent danger of death or serious bodily injury if others were present in that zone or area." Id.

We initially note that the indictment did not specify the victim of the reckless endangerment with a deadly weapon charge. However, such was not necessary because our supreme court in Payne determined that the offense of reckless endangerment could be committed against "the public at large" if the proof demonstrated that members of the public were in imminent danger of death or serious bodily injury due to the defendant's conduct, or, in other words, in the zone of danger. Id. at 28-29; see State v. Marques Lanier Bonds, aka "Mark", No. W2005-02267-CCA-R3-CD, 2006 WL 2663753, at *10 (Tenn. Crim. App. Sept. 15, 2006). The question therefore is whether anyone was in the zone of danger when the defendant discharged his shotgun. The defendant argues that "his action in discharging a weapon into the ground did not and could not have placed any person in such imminent danger as would be required to sustain a conviction" and that "the uncontroverted proof is that the discharge of the weapon was a warning shot."

However, in the light most favorable to the State, the evidence shows that when the defendant discharged his weapon, he was standing on one side of the Cunninghams' driveway, and Matt Haddock was standing on the other side of the driveway – the side toward Patricia Prock's house. Prock's house was uphill from the Cunninghams' driveway, and Prock was on her front porch. When the shot was fired, the two men were standing approximately ten feet apart, and the shot hit, according to Kelly Cunningham, on Haddock's side of the driveway. Thus, a rational trier of fact could have found that both Haddock and Prock were in the zone of danger created by a gunshot discharge in their general direction.

The facts of this case are clearly distinguishable from cases such as State v. Fox, 947 S.W.2d 865, 865-66 (Tenn. Crim. App. 1996), where the defendant shot up in the air into a tree and there was no proof that any person was in the tree or nearby, and State v. Thomas R. Baldwin, No. 01C01-9612-CR-00530, 1998 WL 426199, at *4 (Tenn. Crim. App. July 29, 1998), perm. to appeal denied (Tenn. Feb. 16, 1999), where the only potential victim was behind the defendant when he discharged the weapon. Instead, these facts are closer to those in State v. Steven Willard Self, No. 03C01-9807-CR-002, 1999 WL 553093, at *1-2 (Tenn. Crim. App. July 30, 1999), perm. to appeal denied (Tenn. Jan. 31, 2000), a case in which a panel of this court affirmed a conviction for reckless endangerment where the defendant shot a dog from across the street and the dog's owner was standing approximately fifteen to twenty feet away on her front porch.

The trial court, as the trier of fact, heard the testimony and determined the credibility of the witnesses. We will not second guess its determinations. The defendant has failed to

prove that the evidence is insufficient to sustain his conviction.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE